ENTERED
CLERK, U.S. DISTRICT COURT

APR 1 3 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT

APR 1 2 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIKKO MATERIALS USA, INC., d/b/a GOULD ELECTRONICS, | Case No. **CV 05-4158-JFW (VBKx)** |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| NAVCOM DEFENSE ELECTRONICS, INC., ERNEST JARVIS, and HTJ TRUST, | |
| Defendants. | |

This action came on for a court trial on December 5, 6, and 7, 2006.  Richard Yugler, David Blount, David Goulder, and Jennifer Gates of Landye Bennett Blumstein LLP appeared for Plaintiff Nikko Materials USA, Inc. d/b/a Gould Electronics ("Plaintiff").  Thomas Abbott, Susan Mitchell, Joseph Butler, and David Ginsberg of McKenna Long & Aldridge LLP appeared for Defendant NavCom Defense Electronics, Inc. ("Defendant" or "NDE").  On December 15, 2006, Plaintiff and Defendant filed their respective Post-Trial Briefs and

THIS CONSTITUTES NOTICE OF ENTRY
REQUIRED BY FRCP RULE 77(d).

407

proposed Post-Trial Findings of Fact and Conclusions of Law.[1]

On December 21, 2006, Plaintiff and Defendant filed marked

copies of the opposing party's proposed Post-Trial Findings

of Fact and Conclusions of Law.  After considering the

evidence, briefs, and argument of counsel, the Court makes

the following findings of fact and conclusions of law:

## Findings of Fact[2]

### I.   Procedural Background

At issue in this action is the allocation of

responsibility between two potentially responsible parties

for the costs of remediating groundwater contamination in the

"shallow" and "deep" aquifers underlying the east side of the

El Monte Operable Unit within the San Gabriel Valley

Superfund Site.

On June 9, 2005, Plaintiff filed a Complaint against

Ernest Jarvis and HTJ Trust (erroneously sued as Hyrum

Jarvis) (collectively the "Jarvis Defendants") and Defendant

---

[1] On December 13 and 15, 2007, the parties filed their notices of designated deposition testimony which included the opposing party's objections and the responses thereto.  To the extent that any of the Court's findings of fact rely on deposition testimony offered by the parties, the Court has only considered the admissible portions of that testimony.

[2] The Court has elected to issue its findings in narrative form because a narrative format more fully explains the reasons for the Court's conclusions, which aids appellate review and provides the parties with a more complete explanation of the Court's decision.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

NDE alleging the following claims for relief:

(1) Contribution under Section 113(f)(1) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9613(f)(1), against all defendants; (2) Breach of contract against Defendant NDE; and (3) Declaratory relief that each of the defendants is liable to Plaintiff for future response costs under CERCLA, and that Defendant NDE is obligated to indemnify Plaintiff pursuant to the terms of the October 3, 1988 Assignment and Assumption Agreement.

Plaintiff entered into a settlement agreement with the Jarvis Defendants which was approved as a good faith settlement by the Court on September 7, 2006.  The Jarvis Defendants were, therefore, dismissed with prejudice on November 3, 2006.  As a result, the only claims remaining for trial were those alleged against Defendant NDE.


## II.  Factual Background

In 1984, the United States Environmental Protection Agency ("EPA") designated the San Gabriel Valley as a Superfund Site (the "SGVSS").  The El Monte Operable Unit ("EMOU") is one of eight operable units located within the SGVSS and covers an area of approximately ten square miles in the south central portion of the San Gabriel Basin.

The groundwater in the "shallow" and "deep" aquifers underlying the eastern side of the EMOU is contaminated by halogenated volatile organic compounds ("VOCs"), primarily trichloroethylene ("TCE") and tetrachloroethylene ("PCE"), in

1    levels which exceed the maximum contaminant levels allowed

2    under state and federal drinking water standards.[3]   The EPA

3    has identified a number of "potentially responsible parties"

4    ("PRPs") for the groundwater contamination in the EMOU

5    consisting of current or former owners or operators of sites

6    who used these VOCs over the last four decades.

7

8       **A.   The NavCom Property**

9       Defendant is the current owner of the real property

10   located at 4323 N. Arden Drive, El Monte, California (the

11   "NavCom Property").   The NavCom Property is located on the

12   eastern side of the EMOU.

13      Hoffman Electronics Corporation ("Hoffman") owned the

14   NavCom Property from 1962 to 1977.   In 1962, Hoffman

15   constructed the facility which currently occupies the NavCom

16   Property (the "NavCom Facility").   At the time of its

17   construction, the NavCom Facility contained a vapor degreaser

18   which was associated with a plating line for cleaning metals

19   in the plating room.   Hoffman also installed a plating pit,

20   clarifier C-002, and a wastewater sewer system on the NavCom

21   Property.   Clarifier C-002 consisted of a rectangular

22   concrete tank approximately 8 feet deep, 5.5 feet wide, and

23   16 feet long which collected wastewater from the plating pit

24   in the plating room via underground pipes.   Clarifier C-002

25   acted as a settling basin to remove suspended solids from the

26

27      [3] According to Plaintiff, TCE and PCE are the only
28   groundwater contaminants at issue in this action.   *See*
     Plaintiff's Memo of Contentions of Law and Fact at 1, 6.

1  wastewater.  The "clarified" wastewater was then discharged
2  to the municipal sewer system via underground pipes.
3      Documentary evidence indicates that TCE was likely used
4  by Hoffman in the clarifier at the NavCom Facility from 1962
5  until the late 1960s or early 1970s.  Around that time,
6  stringent air emission restrictions on TCE use in California
7  led many industries, including aerospace and electronics
8  industries, to convert from the use of TCE to PCE.  At some
9  point during that period, Hoffman stopped using TCE and
10 started using PCE for its operations.
11     In 1977, Plaintiff's predecessor, Gould, Inc. ("Gould")
12 acquired 100% of Hoffman's stock and then merged Hoffman into
13 Gould.  As a result of the acquisition and merger, Gould
14 acquired the NavCom Property, the NavCom Facility, and all of
15 Hoffman's liabilities, including environmental liabilities,
16 for the NavCom Property.  In 1980, Gould constructed a
17 storage tank for PCE outside of the NavCom Facility adjacent
18 to the plating pit.  Gould continued to use PCE at the NavCom
19 Facility until approximately 1983.  In or around 1983, Gould
20 ceased using PCE for the majority of its operations.
21     In 1987, Gould retained Pioneer Consultants, an
22 environmental consultant, to investigate the level of soil
23 contamination on the NavCom Property.  In early 1988, Gould
24 removed certain underground tanks and clarifiers from the
25 NavCom Property, but did not remove clarifier C-002.  In 1987
26 or 1988, PCE and TCE were found in the soil around clarifier
27 C-002.  Gould hired Schaefer Dixon Associates ("Schaefer
28 Dixon") to conduct an environmental investigation of the

1    Property.   In June of 1988, Schaefer Dixon prepared a report

2    detailing its investigation and noting that there was TCE and

3    PCE contamination in the soil and groundwater.   The report

4    was forwarded to, among others, the EPA, William Belcher,

5    Vice President of Operations for the NavCom Division, and

6    Michael Veysey, Gould's corporate counsel.   On April 21,

7    1988, Gould installed a groundwater monitoring well, BH-05,

8    immediately adjacent to clarifier C-002.

9        In September of 1988, Gould formed a wholly owned

10   subsidiary, Gould/NavCom Systems, Inc. ("Gould Systems"), and

11   then formed three separate wholly owned subsidiaries of Gould

12   Systems, one of which was Gould/NavCom Systems Division, Inc.

13   ("GNSDI"), incorporated on September 30, 1988.   Gould then

14   transferred the assets and liabilities of its NavCom

15   Division, including the NavCom Property, to GNSDI.   To effect

16   the transfer of the assets and liabilities of the NavCom

17   Division from Gould to GNSDI, Gould and GNSDI executed a Bill

18   of Sale and Assignment Agreement, and also entered into an

19   Assignment and Assumption Agreement dated October 3, 1988

20   (the "Assumption Agreement"), pursuant to which Gould

21   assigned and GNSDI assumed, *inter alia*, the environmental

22   liabilities relating to the NavCom Property.   *See* Defendant's

23   Trial Exhibit 6.5; Court's September 7, 2006 Order on MSJ.

24       Around that same time, a management group from the NavCom

25   Division, led by GNSDI's President, Clifford Christ, formed

26   NCM Holdings, Inc. ("NCM") for the purpose of acquiring GNSDI

27   from Gould Systems.   On October 29, 1988, NCM and Gould

28   Systems entered into a Purchase Agreement pursuant to which

NCM purchased 100% of the stock of GNSDI.  During the negotiations of the Purchase Agreement, the environmental conditions at the NavCom Property were discussed.  NCM proposed that Gould Systems should bear the cost of any remediation, and Gould Systems suggested that there should be a "capped" indemnity.

Ultimately, the parties agreed to the following provision found at Paragraph 6.7 of the Purchase Agreement:

> The Seller [Gould Systems] will indemnify NSD
> [GNSDI] against, and hold it harmless from,
> any and all costs (including natural resources
> damages), costs, fees and expenses, including
> but not limited to attorneys' fees and
> consultants' fees up to a total of $2,500,000,
> (i) of any removal or remediation required by
> any governmental agency because of the
> condition of the soil or groundwater at NSD's
> property in El Monte, California at the date
> of this agreement and (ii) related to a
> cleanup of the Stringfellow hazardous waste
> site, and NSD will bear all damages (including
> natural resources damages), costs, fees and
> expenses, including but not limited to
> attorneys' fees and consultants' fees, of the
> removal or remediation or related to the
> cleanup referred to in clauses (i) and (ii) of
> this Paragraph 6.7 in excess of $2,500,000.
> The Seller will not however, bear the cost of

1            any removal or remediation unless the Seller

2            has approved the plan under which that removal

3            or remediation takes place, which approval

4            will not be unreasonably withheld.

5 *See* Purchase Agreement at ¶ 6.7.

6    As a result of its purchase of 100% of the stock of

7 GNSDI, NCM acquired the liabilities, including the October 3,

8 1988 Assumption Agreement, of GNSDI.  *See* Court's September

9 7, 2006 Order on MSJ.  GNSDI then changed its name to NavCom

10 Defense Electronics, Inc.  NCM merged with the former GNSDI

11 and the merged company took the name NavCom Defense

12 Electronics, Inc. ("NDE"), the Defendant in this action.

13    From the time of its acquisition of GNSDI in 1988 to the

14 present, Defendant NDE continued to operate the NavCom

15 Division on the NavCom Property.  However, there is no

16 evidence in the record that as part of its operations,

17 Defendant discharged either TCE or PCE to clarifier C-002

18 after it acquired the NavCom Property.  On August 15, 1990,

19 the Los Angeles Region of the California Regional Water

20 Quality Control Board ("CRWQCB") determined that wastes were

21 leaking from clarifier C-002 and directed Defendant to cease

22 further use of the clarifier.

23    In 1991, Defendant installed 8 additional groundwater

24 monitoring wells on the NavCom Property.  Also in 1991,

25 Schaefer Dixon recommended that Defendant utilize soil vapor

26 extraction technology to remediate the soil on the NavCom

27 Property.  In 1993, Defendant removed clarifier C-002 and

28 sumps S-003 and S-004.  When the clarifier was removed,

1   Defendant's consultant at the time, Environmental Resources

2   Management, backfilled the removal site with the contaminated

3   soil.

4        In March of 1996, Defendant installed and initiated a

5   full scale soil vapor extraction ("SVE") and treatment system

6   on the NavCom Property.  During the two years of the

7   operation of the SVE system, Defendant removed 8,964 pounds

8   of VOCs from the soil.  In November of 1998, the CRWQCB

9   informed Defendant that because the SVE system had reached an

10  "asymptotic" state, no further remediation of the soil at the

11  NavCom Property was necessary.

12

13       **B.   The Birtcher Property**

14       From 1960 until 1967, Hoffman also owned the real

15  property to the north of the NavCom Property located at 4505

16  Arden Drive, El Monte, California (the "Birtcher Property").[4]

17  Johnson Controls, formerly Globe Union, owned the Birtcher

18  _____

19       [4] Originally, Hoffman also owned the real property
    located between the Birtcher and NavCom Properties which is
20  now occupied by Vons Corporation/Vons Credit Union (the "Vons
    Property").  Plaintiff's liability for the Birtcher Property
21  arises out of Gould's acquisition of Hoffman in 1977, at
    which time Gould also acquired Hoffman's environmental
22  liabilities for the seven years that Hoffman owned the
    Birtcher Property.  Although Plaintiff is only liable as a
23  PRP for the seven years that Hoffman owned the Birtcher
    Property, as a working party and for purposes of this
24  litigation, Plaintiff is responsible for all of the
    contamination resulting from releases of TCE and PCE on the
25  Birtcher Property. This is consistent with the Court's
    finding, *infra*, that any money received by Plaintiff from
26  other PRPs for the Birtcher Property is not offset against
    Defendant's liability, but instead is retained by Plaintiff
27  to be used toward the costs of remediation allocated to the
    Birtcher Property.

28

1   Property from 1967 to 1977.  The Jarvis Defendants have
2   owned the Birtcher Property since 1977, but leased the site
3   to Birtcher Medical from 1977 to 1980, to EG&G Birtcher from
4   1984 to 1988, and to Hermetic Seal from 1999 to the present.
5        In 1960, the Solar Energy Division of Hoffman installed a
6   clarifier on the northeast corner of the Birtcher Property.
7   As part of Hoffman's operations on the Birtcher Property, TCE
8   and PCE were used as an industrial degreasing agent.
9   Additionally, for approximately 15 months in 1960 and 1961,
10  employees of Hoffman, including Lou Pedrola, disposed of
11  thousands of gallons of undiluted TCE and other VOCs,
12  including PCE, by pouring them directly onto the ground at
13  the southwest corner of the Birtcher Property.  Subsequent
14  owners of the Birtcher Property also used TCE and PCE as part
15  of their operations.
16       In 1998, two SVE systems were installed at the northeast
17  and southwest corners of the Birtcher Property.  After two
18  years, by September of 2000, 4,381 pounds of VOCs had been
19  removed from the soil on the Birtcher Property.  By April of
20  2004, another 1,910 pounds of solvents had been removed.  At
21  that time, the rate of VOC mass removal had slowed to about
22  two pounds a day, a rate approximately equal to the rate of
23  removal at the time the system on the NavCom Property was
24  shut down.
25  / / /
26  / / /
27  / / /
28  / / /

1   **C.   The Chadwick Property**

2   Federal Mogul owned the real property located to the

3   north of the Birtcher Property at 4601 N. Arden Drive (the

4   "Chadwick Property") from 1958 to 1965.  Clevite then owned

5   the site until 1969, at which time Clevite was acquired by

6   and merged with Plaintiff's predecessor, Gould.  Gould owned

7   the site until 1978.  Chadwick-Helmuth has owned the site

8   since 1978.

9   In 1989, the CRWQCB requested that a soil contamination

10  investigation be performed at the Chadwick Property.   Soil

11  contamination was found in a single location on the Chadwick

12  Property near a former clarifier and chemical storage shed on

13  the south side of the building occupying the Property.

14  In February 1999, a SVE system was installed on the

15  Chadwick Property.  During the first approximately 5 months

16  of the system's operation, 81 pounds of VOCs were extracted

17  from the soil.  From July 1999 through June 2000 when the

18  operation ceased, there was little increase in soil gas

19  measurements.

20

21  **D.   City of El Monte Well EM-5**

22  In August 1947, the City of El Monte (the "City") drilled

23  well EM-5 to provide drinking water for the City.  Well EM-5

24  is located on the eastern side of the EMOU to the southeast

25  of the NavCom Property, is 358 feet deep, has a steel casing

26  which is perforated in six zones, and has well screen

27  intervals in both the shallow and deep groundwater aquifers.

28  A plume of VOC contamination (principally PCE and TCE) has

1  been identified in the deep aquifer underlying the eastern
2  side of the EMOU.  The plume appears to emanate from well
3  EM-5 and extends approximately one mile to the
4  south/southwest of the well.

5      Well EM-5 was taken out of service by the City in 1980
6  when the City first learned that it was contaminated with
7  VOCs.  In 1995, the City's environmental consultant, Dames &
8  Moore, was the first to suggest that well EM-5 was acting as
9  a conduit for the VOC contamination in the shallow aquifer to
10 migrate to the deep aquifer.  After further investigations,
11 in 1999 the City abandoned well EM-5 by filling the well with
12 concrete to prevent the well from further acting as a conduit
13 for VOC contaminated water to reach the deep aquifer.

14

15     **E.    Remediation of the Groundwater Underlying the EMOU**
16     After designating the San Gabriel Valley as a Superfund
17 Site in 1984, the EPA began its investigation and enforcement
18 efforts in the EMOU in 1985.  At the same time, the CRWQCB
19 initiated a Well Investigation Program in conjunction with
20 the EPA to identify sources of groundwater contamination.
21     On October 7, 1994, pursuant to 42 U.S.C. § 9622(e), the
22 EPA sent Special Notice letters to 17 PRPs of the EMOU
23 requesting that those PRPs present a good faith offer ("GFO")
24 to perform a Remedial Investigation/Feasibility Study
25 ("RI/FS").  Defendant was one of the PRPs to receive an
26 October 7, 1994 Special Notice letter.  Plaintiff did not
27 receive a Special Notice letter from the EPA at this time.
28 / / /

1   In 1994, a group of 15 of the PRPs who had received the

2   October 7, 1994 Special Notice letter from the EPA formed the

3   Northwest El Monte Task Force (the "Task Force") to

4   facilitate investigation and remediation of the EMOU and to

5   negotiate allocation of responsibility among its members.

6   Although Plaintiff had not received a Special Notice letter

7   from the EPA, on February 15, 1995, Plaintiff requested that

8   it be permitted to attend and participate in Task Force

9   meetings.  The Task Force agreed to the request on April 4,

10  1995.

11   On March 16, 1995, the EPA entered into an Administrative

12  Order on Consent ("AOC") with the Task Force, pursuant to

13  which the Task Force agreed to perform a RI/FS.  Consistent

14  with its obligations under Paragraph 6.7 of the Purchase

15  Agreement, Defendant submitted the AOC to Plaintiff for

16  approval before signing the AOC.  Shortly thereafter, at the

17  March 23, 1995 meeting of the Task Force, Ken Russo, a Vice

18  President of Defendant, was unanimously elected as the

19  Chairman of the Task Force.  Mr. Russo remained the Chairman

20  of the Task Force through the completion of the RI/FS for the

21  EMOU in June of 1999.

22   From 1996 though 1998, pursuant to the RI/FS, the Task

23  Force conducted a field program, installed monitoring wells

24  to the shallow and deep aquifers, monitored groundwater

25  contamination levels, identified and evaluated remedial

26  action objectives and alternatives, and prepared reports for

27  the EPA.  Additionally, the Task Force, under the direction

28  of Mr. Russo, worked with the San Gabriel Water Quality

1  Authority ("WQA") in an effort to obtain federal, state and
2  local grant funds.  The Task Force also worked to identify
3  additional PRPs and provided such information to the EPA.
4  During this time period, the Task Force members had
5  negotiated an interim allocation of costs.  Defendant was
6  responsible for a 10% share - the third highest share.
7  Plaintiff paid Defendant's share of the interim allocation as
8  part of its indemnification obligations under Paragraph 6.7
9  of the Purchase Agreement.

10      After the EPA issued its Record of Decision in 1999, the
11  Task Force negotiated for years in an attempt to reach a
12  final allocation of responsibility for the costs necessary to
13  implement the remedy that would be acceptable to all of the
14  members of the Task Force.  The representatives from the four
15  most contaminated sites, Hermetic Seal, Clayton, EG&G, and
16  Defendant (the "Big Four"), along with a representative from
17  Plaintiff, met separately from the rest of the Task Force on
18  a number of occasions to discuss possible allocation
19  percentages.  One proposal which was discussed allocated a
20  15.5% share to Hermetic Seal, with Clayton, EG&G, and
21  Defendant each responsible for an 11.5% share (the "Big Four
22  Proposal").  The Big Four Proposal grouped the remaining PRPs
23  at four levels, with the percentage allocation based on the
24  level.

25      On July 12, 2001, the EPA sent Special Notice letters to
26  PRPs for the EMOU, including Plaintiff, requesting that the
27  PRPs provide the EPA, within 60 days, a second GFO to
28  implement the remediation of the groundwater underlying the

1  EMOU.   The Task Force agreed to hire a mediator to assist

2  with the negotiation of the allocation percentages to be used

3  in the GFO.   The first Task Force mediation was scheduled for

4  August 13 & 14, 2001.   The Big Four submitted their Proposal

5  to the mediator and the other PRPs.   Prior to the mediation,

6  the PRPs also agreed to submit their five highest soil

7  sampling results, their five highest soil vapor sampling

8  results, and their five highest groundwater sampling results

9  for distribution to all PRPs participating in the mediation.

10 At the time of these allocation meetings, although Plaintiff

11 was aware of the dumping of PCE and TCE by Mr. Pedrola and

12 other Hoffman employees on the Birtcher Property in 1960 and

13 1961, other PRPs such as Hermetic Seal were not aware of this

14 information.

15      At the August 13, 2001 mediation, PRP Union Pacific

16 Railroad disclosed that Defendant had not submitted its

17 highest soil and groundwater sampling results to the mediator

18 and other PRPs.   Upon review of the evidence and testimony,

19 the Court finds that this failure was a mistake on the part

20 of Defendant, and not an intentional effort to "hide" its

21 data.   On behalf of Defendant, Mr. Russo apologized for the

22 error, and the mediation was adjourned until August 22, 2001.

23      The following day, Mr. Christ and Mr. Russo of Defendant

24 met with Robert Fedor and Mr. Veysey of Plaintiff to "review

25 environmental issues."   At the meeting, Mr. Christ advised

26 Plaintiff of Defendant's position that the NavCom Property

27 should not be liable for more than 5% of the future

28 remediation costs for the EMOU.   On August 20, 2001, Mr.

1  Christ and Mr. Russo received a letter from Mr. Veysey which

2  accused Defendant of an anticipatory breach of its

3  obligations to Plaintiff under Paragraph 6.7 of the Purchase

4  Agreement.  On August 21, 2001, Mr. Christ sent a response to

5  Mr. Veysey rejecting Mr. Veysey's claim of anticipatory

6  breach and informing Mr. Veysey that "NavCom has met all its

7  obligations and will continue to do so."  Additionally, Mr.

8  Christ advised Mr. Veysey that if Plaintiff elected to make

9  an offer to the other members of the Task Force which

10  included the NavCom Property, Plaintiff did so at its own

11  risk.

12      Notwithstanding Defendant's warning, at the August 22,

13  2001 mediation, Plaintiff offered a 36.5% share on behalf of

14  the NavCom, Birtcher, and Chadwick Properties.[5]  After making

15  this offer to the other PRPs, in private negotiations between

16  Plaintiff and Defendant outside of the mediation, Plaintiff

17  proposed that Defendant should bear responsibility for 21% of

18  the 36.5% share offered by Plaintiff.  Plaintiff also

19  "invited" Defendant to participate in the GFO with the other

20  PRPs at whatever percentage Defendant chose, as long as

21  Plaintiff and Defendant reserved all rights "with respect to

22  these allocation issues and contractual obligations as

23  between Gould and NavCom."  Defendant declined to participate

24  in the GFO.

25  / / /

26  _____

27  [5] Plaintiff's predecessor in interest, Gould, or Gould's
    predecessor in interest, Hoffman, are former owners and
    operators of each of these sites.

28

1     Based on the GFO submitted by the PRPs, the EPA

2  negotiated a settlement with the majority of the PRPs for the

3  EMOU.   Pursuant to the terms of the settlement, the EPA

4  formally separated the EMOU into the East Side[6] and the West

5  Side.   The settlement is memorialized in the Consent Decree

6  entered April 16, 2004 in an action in this district entitled

7  *United States of America v. Adams Family Trust, et al.*, Case

8  No. CV04-1490 RSWL(CWx).   Pursuant to the terms of the

9  Consent Decree, Gould and Johnson Controls were identified as

10  the "working parties" who agreed and are jointly obligated to

11  implement and pay for the remediation of the groundwater on

12  the East Side EMOU and to reimburse the EPA and the

13  California Department of Toxic Substances Control for certain

14  past and future oversight costs.[7]   The PRPs who are parties to

15  the Consent Decree agreed to pay certain sums to toward past

16  and future costs of remediation of the shallow and deep

17  aquifers of the EMOU ("response costs").   In exchange, those

18  parties were released from liability by the EPA and received

19  protection from actions for contribution by other current or

20  former owners or operators of property within the EMOU.

21

22     [6] From north to south, the Chadwick Property, Birtcher
   Property, Vons Property, Navcom Property, and City well EM-5
   are all located in the East Side EMOU.  *See, e.g.,*
23  Plaintiff's Trial Exhibit 673 at p. 20.

24     [7] Prior to trial, on October 31, 2005, Johnson Controls
   assigned to Plaintiff all rights or claims for contribution
25  that Johnson Controls has against Defendant for past and
   future damages, costs, and expenses relating to the
26  undertaking and completion of all work related to the
   remediation of the EMOU.  *See* Plaintiff's Trial Exhibit 2623.
27  Accordingly, unless otherwise stated, any reference herein to
   Plaintiff shall also refer to Johnson Controls for the
28  purpose of allocation and recovery of CERCLA response costs.

III.     **Plaintiff's First Claim for Relief for Contribution
         Under CERCLA**

"CERCLA provides that persons who are liable or potentially liable under § 107(a) [42 U.S.C. § 9607(a)] may seek contribution from each other using the mechanics set forth in § 113(f) [42 U.S.C. § 9613(f)]." *Western Properties Service Corporation v. Shell Oil Company*, 358 F.3d 678, 688 (9th Cir. 2004). In order to prove that it is entitled to contribution from Defendant, Plaintiff must first establish the following elements under Section 107(a): "(1) the site on which the hazardous substances are contained is a 'facility' under CERCLA's definition of that term, Section 101(9), 42 U.S.C. § 9601(9); (2) a 'release' or 'threatened release' of any 'hazardous substance' from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan,' 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a)." *3550 Stevens Creek Associates v. Barclays Bank of California*, 915 F.2d 1355, 1358 (9th Cir. 1990).

The Court finds, and Defendant does not dispute that Plaintiff has established each of the foregoing elements by a preponderance of the evidence. Once Defendant's liability as a PRP under Section 107(a) is established, Plaintiff must then prove that it has paid more than its equitable share of the CERCLA response costs.

1    It is Plaintiff's burden to prove that the percentage of

2    response costs that it seeks to have the Court allocate to

3    Defendant is equitable and appropriate.  *See, e.g., Elementis*

4    *Chromium L.P. v. Coastal States Petroleum Co.*, 450 F.3d 607,

5    612 (5th Cir. 2006); *Minyard Enterprises, Inc. v.*

6    *Southeastern Chemical & Solvent Company*, 184 F.3d 373, 387

7    (4th Cir. 1999); *Centerior Service Company v. Acme Scrap Iron*

8    *& Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998) ("In actions

9    seeking contribution, unlike those for joint and several cost

10   recovery, the burden is placed on the plaintiff to establish

11   the defendant's equitable share of response costs.").

12   Section 113(f)(1) provides that: "[i]n resolving

13   contribution claims, the court may allocate response costs

14   among liable parties using such equitable factors as the

15   court determines are appropriate."  42 U.S.C. § 9613(f)(1).

16   "This language gives district courts discretion to decide

17   what factors ought to be considered, as well as the duty to

18   allocate costs according to those factors."  *Boeing v.*

19   *Cascade*, 207 F.3d 1177, 1187 (9th Cir. 2000).  "Section 113

20   does not require a court to consider a particular list of

21   factors . . ..  Depending on the totality of circumstances, a

22   court may consider many factors, a few factors, or it may

23   find one factor determinative."  *Boeing v. Cascade*, 920 F.

24   Supp. 1121, 1132 (D. Or. 1996).

25   "The array of (sometimes overlapping) equitable factors

26   identified by courts include (1) the parties' relative fault

27   or culpability; (2) the ability of the parties to demonstrate

28   that their contribution to a discharge, release, or disposal

1  of a hazardous waste can be distinguished; (3) the amount of
2  hazardous waste involved; (4) the degree of toxicity; (5) the
3  degree of involvement of the parties in the generation,
4  transportation, treatment, storage, or disposal of hazardous
5  waste; (6) the degree of care exercised by the parties with
6  respect to the hazardous waste; (7) the degree of cooperation
7  by the parties with government agencies to prevent harm to
8  the public health or environment; (8) financial resources or
9  economic status; (9) economic benefits received by the
10 parties from contaminating activities or remediation; (10)
11 knowledge and/or acquiescence of the parties in the
12 contaminating activities; and (11) contracts between the
13 parties." *Waste Management of Alameda County, Inc. v. East*
14 *Bay Regional Park Transit*, 135 F. Supp. 1071, 1089-90 (N.D.
15 Cal. 2001).

16

17     **A.   Application of the Equitable Factors**
18     Both Plaintiff and Defendant agree that the TCE and PCE
19 releases from the NavCom and Birtcher Properties account for
20 virtually all of the groundwater contamination at issue in
21 this case.  Accordingly, the Court must use equitable factors
22 to allocate the responsibility for the groundwater
23 contamination by TCE and PCE between the parties for the
24 NavCom and Birtcher Properties.
25     The Court finds that the equitable factor entitled to the
26 greatest weight in this case involves the "contracts between
27 the parties."  The two contracts relevant to the Court's
28 analysis are the Assumption Agreement between Gould and

1   GNSDI, and the Purchase Agreement between Gould Systems and

2   NCM.

3       In conjunction with the transfer of the NavCom Division

4   from Gould to GNSDI in 1988, Gould and GNSDI entered into the

5   Assumption Agreement, pursuant to which GNSDI agreed to

6   indemnify Gould for the liabilities, including environmental

7   liabilities, of the NavCom Property.  The Court has

8   previously found that when NCM acquired GNSDI and then merged

9   with GNSDI to form NDE, "[b]ecause the Assumption Agreement

10  was one of the liabilities of GNSDI/NavCom Defense

11  Electronics, Inc. at the time it was merged with NCM, the

12  Assumption Agreement became one of the liabilities of the

13  surviving corporation, NDE," and that, as a result, "the

14  indemnification provision of the Assumption Agreement is

15  enforceable against Defendant." *See* Court's September 7,

16  2006 Order on MSJ.  Accordingly, under the terms of the

17  Assumption Agreement, Defendant is responsible for 100% of

18  Plaintiff's liability for the contamination on the NavCom

19  Property.[8]

20  / / /

21  _____

22      [8] Defendant argues that it was excused from performing
    under the Assumption Agreement because Plaintiff's actions
23  during the Task Force negotiations "frustrated" Defendant's
    performance of its obligations under that Agreement.
24  However, Defendant did not plead an affirmative defense of
    "frustration of performance" in its Answer, and the Court
25  will not void Defendant's obligations under the Assumption
    Agreement on those grounds.  Although the Court finds that
26  Plaintiff's aggressive tactics during the Task Force
    negotiations placed Defendant in a vulnerable position as
27  discussed by the Court, *infra*, the Court will only take those
    tactics into consideration as part of the equitable process
    of allocating liability.

28

1  However, at the time NCM purchased GNSDI from Gould

2  Systems, the parties negotiated an indemnification provision

3  which provided that Gould Systems would indemnify NCM for the

4  first $2,500,000 of costs, fees, and expenses related to

5  remediation of certain properties, including the NavCom

6  Property.[9]  *See* Purchase Agreement at ¶ 6.7.  The parties to

7  the Purchase Agreement further agreed that NCM would be

8  responsible for all costs, fees, and expenses in excess of

9  $2,500,000.  *See id.*

10  Defendant contends that when the parties included the

11  $2,500,000 limit in the Purchase Agreement, they believed

12  that the agreed amount greatly exceeded the potential

13  environmental liability present on the NavCom Property at the

14  time of the sale.[10]  At trial, Defendant presented evidence

15  that it was the intent of the parties in 1988 that Gould

16  would indemnify Defendant for all of the costs associated

17  with future remediation of the environmental contamination at

18  the NavCom Property.  Specifically, Mr. Christ testified that

19  during the negotiation of the Purchase Agreement, he

20  expressed concern to Jerry Gaskin, Gould's Chief Financial

21  Officer, regarding the amount of the "cap."  Mr. Christ

22  further testified that Mr. Gaskin had assured him that the

23

24  [9] Although Gould Systems was dissolved on December 30, 1993, Plaintiff continued to fulfill the obligations of Gould Systems under the Purchase Agreement.

25

26  [10] Additionally, Defendant argues that the Court should rescind the Purchase Agreement on the grounds of mistake. However, there are no claims alleged in this action based on

27  the Purchase Agreement which would allow the Court to determine that rescission of the Purchase Agreement is

28  appropriate.

amount agreed upon was "more than enough" to cover future
environmental liability, but that if it was not, the amount
would be increased as long as Mr. Christ managed the
environmental liabilities at the facility and made a good
faith effort to keep the costs of remediation to a minimum.[11]

Although Defendant's evidence as to the parties' intent
supports its contention, Defendant's position is directly
contradicted by the express terms of the Purchase Agreement,
as well as Mr. Christ's admission at trial that his position
with respect to the amount of the cap was "weak." *See*
12/7/06 Tr. at 75:25-78:22. If the intent of the parties was
to indemnify GNSDI for an unlimited amount, then the parties
would not have included a "cap" in the Purchase Agreement.
Although the parties may have actually intended the
indemnification provision to cover a greater percentage of
the environmental liability, the Court will not speculate and
"re-write" the Purchase Agreement to insert a greater number
as the "cap," particularly in the absence of any evidence on
which to base such a number. The parties clearly intended to
place a "cap" on Gould's exposure under the indemnification
provision, and the Court will consider the amount agreed upon
by the parties in the Purchase Agreement.

If Plaintiff was only responsible for contamination on
the NavCom Property, the Court's analysis would end here, and
Defendant would be liable for 100% for the contamination

---

[11] Although Plaintiff failed to make a motion to strike
Paragraphs 1-22 of Mr. Christ's trial declaration, to the
extent objections were preserved during trial, those
objections are hereby overruled.

caused by Plaintiff and Defendant on the NavCom Property less the $2,500,000 indemnification obligation contained in the Purchase Agreement.[12]  However, in addition to the NavCom Property, Plaintiff is also responsible for a portion of the contamination found on the Birtcher and Chadwick Properties.[13]

As a result, the Court finds that the overlapping equitable factors involving "the parties' relative fault or culpability" and "the degree of involvement of the parties in the generation, transportation, treatment, storage, or disposal of hazardous waste" are also entitled to significant weight.  Proper application of these equitable factors to this case requires separate consideration of the contamination of the "shallow" aquifer and the "deep" aquifer.

/ / /

/ / /

/ / /

/ / /

---

[12] As a result of its acquisition of Hoffman in 1977, Gould is responsible for any contamination caused by Hoffman on the NavCom Property.  Because there is no evidence of any environmental contamination on the NavCom Property preceding Hoffman's purchase of the Property, the Court finds that Plaintiff and Defendant are the only PRPs with respect to the NavCom Property.

[13] Although Plaintiff never directly owned the Birtcher Property, as a result of its acquisition of Hoffman in 1977, Plaintiff assumed the liabilities arising out of Hoffman's activity on that Property from 1961-1967.  With respect to the Chadwick Property, Plaintiff is not only responsible for contamination resulting from its own activities on the Property from 1969 through 1978, it is also responsible for contamination caused by its predecessor in interest, Clevite, from 1965-1969.

1            1.   <u>Contamination of the "shallow" aquifer</u>.

2       At trial, Plaintiff's experts opined that releases from

3  the NavCom Property were responsible for 80% of the TCE and

4  PCE contamination found in the groundwater of the shallow

5  aquifer underlying the East Side EMOU.   Specifically,

6  Plaintiff's experts concluded that 67% of the TCE

7  contamination in the shallow aquifer came from releases on

8  the NavCom Property, while the remaining 33% came from

9  releases on the Birtcher and Chadwick Properties.

10  Plaintiff's experts also concluded that 93% of the PCE

11  contamination in the shallow aquifer came from releases on

12  the NavCom Property.

13       The parties' experts agree that groundwater flow from the

14  shallow aquifer underlying the East Side EMOU was

15  historically oriented in a southwesterly or south-

16  southwesterly direction.   Notwithstanding this fact, the

17  groundwater models created by Plaintiff's experts had the

18  groundwater flowing in a northeasterly direction for a

19  substantial portion of the relevant time period.

20  Additionally, the assumptions on which Plaintiff's experts

21  relied in reaching their conclusions were in some instances

22  inaccurate, and in most instances skewed in favor of the

23  Birtcher Property.

24       For example, the model created by Plaintiff's expert, Sam

25  Williams, relies on an assumption that there was no

26  contamination of the groundwater by PCE in the northeast

27  corner of the Birtcher Property, even though PCE had been

28  detected in the soil at that location.   Additionally, Mr.

1   Williams used uniform assumptions for the release of PCE and

2   TCE at each of the relevant sites over the entirety of the

3   relevant time period.  These assumptions resulted in a model

4   based on the release of PCE starting in 1960 - ten years

5   before it was used in the industry, and an assumption that

6   the use of TCE continued through 2006 - even though it was

7   discontinued at the latest in the early 1970s.

8        Compounding this defect, Mr. Williams's model utilizes an

9   assumption that the concentration of TCE in the groundwater

10  for the period from 1960 to 1980 was at the maximum level

11  ever measured at either site.  Yet the samples for the NavCom

12  Property were taken from the well which is directly adjacent

13  to the clarifier, while the samples for the Birtcher Property

14  came from a well which is directly between the two relevant

15  sources of contamination on the Birtcher Property.

16  Plaintiff's experts admitted at trial that the level of

17  contamination is always higher at the source of the

18  contamination, but did not make adjustments that would

19  account for the fact that the samples from the Birtcher

20  Property were not taken near either source of contamination

21  on that Property.

22       The method used by Plaintiff's experts' to calculate

23  their ultimate opinion that 80% of the contamination of the

24  shallow aquifer is allocable to Defendant is equally inexact,

25  as they simply averaged their allocations of PCE and TCE

26  contamination.  This method assumes that the total amount of

27  TCE and PCE contamination on the East Side EMOU is equal.

28  Clearly since the measured ratio of TCE to PCE on the NavCom

1  Property is 1:1, and the ratio of TCE to PCE on the Birtcher

2  Property is 4:1, the total amount of TCE contamination does

3  not equal the total amount of PCE contamination.

4      In contrast, Defendant's expert, Stephen Larson, opined

5  that only 33% of the contamination of the shallow aquifer

6  came from releases on the NavCom Property.  Specifically, Mr.

7  Larson opined that the releases of PCE from the NavCom and

8  Birtcher Properties were roughly equal, but that releases of

9  TCE at the Southwest corner of the Birtcher Property

10  accounted for 90% of the TCE contamination in the

11  groundwater.

12      However, Mr. Larson's opinion is equally flawed.  His

13  opinion was initially based on an assumption that the

14  clarifier on the NavCom Property was not used until 1973 - 10

15  years after it was installed.  Incredibly, after he was

16  confronted with this error at trial, he testified that the

17  additional ten years of leaking and contamination would not

18  change his opinion regarding the allocation of liability for

19  contamination of the shallow aquifer.  Mr. Larson's model

20  also failed to account for the impact of the "high" versus

21  "low" water years on the direction of groundwater flow, and

22  used an extremely steep gradient or slope for the flow of

23  groundwater so as to eradicate any pumping effect from Azusa

24  1, the well north of the Birtcher Property.

25      Based on the foregoing, the Court finds that neither

26  Plaintiff's nor Defendant's experts' models are without flaws

27  - indeed both parties' experts conceded at trial that no

28  model is perfect.  *See* 12/5/06 Tr. at 179:3; 12/7/06 Tr. at

213:6-7.  Moreover, the parties' respective models appear to be the product of a certain amount of "overreaching" by the experts in favor of the party who employed them.  As a result, the Court finds that the expert testimony offered by either party fails to provide an accurate representation of the proper allocation of liability for the groundwater contamination of the East Side EMOU.

Plaintiff argues that in allocating liability, the Court must decide which party's expert presentation is more persuasive and then issue findings consistent with that expert's conclusions.  However, given the defects described above, the Court will not simply adopt the opinion of the expert whose report contains the fewest flaws.  Rather, in allocating liability, the Court must also look to the other probative evidence in the record regarding the amount of contamination on each of the Properties at issue.

Although the Court recognizes that both parties' experts agree that the number of pounds of VOCs extracted by the SVE systems installed on each of the relevant Properties is not determinative of the degree of liability for groundwater contamination at each site, when considered in conjunction with the testimony of the experts, the Court finds that the amount of contaminants withdrawn from each Property is the the most persuasive evidence of the actual level of contamination of the Properties.

The parties do not dispute that during the first approximately two years that a SVE system was used on the NavCom Property, the SVE system removed 8,964 pounds of VOCs.

1  After that time, it was determined that the SVE system had
2  reached an asymptotic state, as it was consistently removing
3  between two and three pounds of VOCs a day, and that no
4  further remediation of the soil was necessary.

5      During that same approximate amount of time, the two SVE
6  systems installed on the Birtcher Property removed 4418
7  pounds of VOCs from the soil.  At the time they were shut
8  down because they had reached an asymptotic state, the SVE
9  systems had removed a total of 6328 pounds of VOCs from the
10 soil.  The SVE system installed on the Chadwick Property
11 removed only 81 pounds of VOCs from the soil before it
12 reached an asymptotic state.

13     When the Court compares the total amount of VOCs removed
14 from the NavCom Property as compared to the Birtcher and
15 Chadwick Properties, the contamination on the NavCom Property
16 accounts for approximately 58% of the total contamination on
17 the relevant Properties.  Even if the Court restricts its
18 comparison to the amount of VOCs removed from the soil during
19 the same approximate time frame, NavCom is still only
20 responsible for approximately 66% of the soil contamination
21 of the East Side EMOU.

22     The evidence of soil contamination, when weighed with the
23 competing expert opinions, provides the Court with a fair
24 basis for allocating liability, as it was the contamination
25 of the soil that ultimately led to the contamination of the
26 shallow aquifer.  Accordingly, the Court finds that 66% of
27 the contamination of the shallow aquifer is allocable to the
28 NavCom Property, while the remaining 34% of the contamination

1  of the shallow aquifer is allocable to the Birtcher and

2  Chadwick Properties.

3

4        2.    Contamination of the "deep" aquifer."

5        Both parties' experts agree that City well EM-5 provided

6  the conduit through which the contamination in the shallow

7  aquifer migrated to the deep aquifer.  The Birtcher Property

8  is 750 feet to the north of the NavCom Property, and well EM-

9  5 is located 1,500 feet to the southeast of the NavCom

10  Property.

11        Plaintiff's experts opine that releases of TCE and PCE

12  from the NavCom Property were responsible for 100% of the

13  contamination of the groundwater in the deep aquifer

14  underlying the East Side EMOU.  Using groundwater models,

15  Plaintiff's experts concluded that the contaminant plume from

16  the Birtcher Property did not reach well EM-5 before the City

17  filled well EM-5 with concrete in 1999.  This conclusion is

18  based on the pumping effect of Azusa 1, a well to the north

19  of the Birtcher Property, the variable direction of the

20  groundwater flow affected by the changing level of the water

21  table, and the additional distance contamination from the

22  Birtcher Property would have had to travel to reach well

23  EM-5.

24        The opinion of Plaintiff's experts is largely based upon

25  their conclusion that Azusa 1 created a "stagnation point" to

26  the south of the Birtcher Property on the Vons Property.  The

27  location of the stagnation point is based on assumptions

28  involving groundwater transmissivity.  According to

1 Plaintiff's experts, the alleged location of this stagnation

2 point would have prevented any contaminated groundwater under

3 the Birtcher Property from flowing south toward EM-5 for the

4 26 years before Azusa 1 was shut down in 1986.

5 However, Mr. Williams conceded on cross examination that

6 the parameter used for groundwater transmissivity was 4-5

7 times higher than the measured data actually taken from the

8 relevant Properties.  Mr. Williams also admitted that if the

9 modeling parameter was not 4-5 times higher than the measured

10 data, the stagnation point would have been north of the

11 Birtcher Property, and the flow of contaminated groundwater

12 toward well EM-5 would not have been impeded.

13 Additionally, the evidence presented during trial

14 demonstrated that while the contamination of the NavCom

15 Property was the result of leaking pipes connected to the

16 clarifier, a substantial portion of the contamination on the

17 Birtcher Property was the result of dumping thousands of

18 gallons of undiluted TCE and PCE directly onto the ground in

19 1960 and 1961.  Accordingly, the extent of the groundwater

20 contamination from the Birtcher Property would have initially

21 been much higher, while the contamination from the NavCom

22 Property would have built up over time.  Given the

23 substantial early contamination of the Birtcher Property,

24 coupled with the fact that the stagnation point was likely

25 further north than Plaintiff's experts claimed it was, the

26 Court finds that contamination from the Birtcher Property

27 played a role in the contamination of the deep aquifer.

28 / / /

1      Prior to trial, Defendant's expert, Mr. Larson, opined

2  that only 11% of the contamination of the deep aquifer was

3  the result of releases at the NavCom Property, and he

4  attributed the remaining 89% to releases at the Birtcher

5  Property.  However, after Mr. Larson was confronted at trial

6  with the fact that he had not used the correct start date for

7  the operation of the clarifier on the NavCom Property, his

8  opinion increased the allocation to the NavCom Property from

9  11% to 30%.  Yet even with this correction, Mr. Larson's

10  opinion still failed to take into account any potential

11  pumping effect by Azusa 1.  Moreover, his use of

12  "fingerprinting" to support his conclusions failed to

13  consider samples from a number of monitoring wells which are

14  located between the Birtcher Property and well EM-5.[14]

15      Like the opinions reached by the parties' experts on the

16  allocation of contamination for the shallow aquifer, their

17  conclusions as to proper allocation for the deep aquifer are

18  equally flawed and appear to be result-oriented.  Taking into

19  consideration the large quantities of PCE and TCE dumped

20  directly onto the soil at the southwest corner of the

21  Birtcher Property, the continued use of PCE and TCE over time

22  at the NavCom Property, and the relative location of EM-5 to

23

24      [14] Defendant also argues that the Court should allocate
some of the liability for the contamination of the deep
aquifer to the City of El Monte for its failure to properly
25  abandon well EM-5 prior to 1999.  However, as discussed
further, infra, not only has Defendant failed to establish
26  that the City is a PRP under CERLCA, the City has already
agreed to perform "in-kind" services to remediate the
27  groundwater underlying the East Side EMOU.  These "in-kind"
services will inure to the benefit of Defendant.

28

1    each of the Properties, the Court finds that 66% of the

2    contamination of the deep aquifer is allocable to Defendant,

3    and the remaining 34% is allocable to Plaintiff.

4         Plaintiff argues that once the Court decides the

5    allocation based relative fault, the Court should increase

6    Defendant's contribution to 100% using the remaining

7    equitable factors.  Essentially, Plaintiff claims that it

8    should not have to bear any of the response costs for

9    remediating the groundwater underlying the East Side EMOU.

10   Plaintiff's primary argument is based on the equitable factor

11   involving "the degree of cooperation by the parties with

12   government agencies to prevent harm to the public health or

13   environment."  Specifically, Plaintiff claims that the Court

14   should increase Defendant's share as a result of Defendant's

15   alleged decision to "walk away" from the Task Force

16   negotiations, leaving Plaintiff to negotiate on behalf of the

17   NavCom Property, and Defendant's subsequent refusal to enter

18   into the Consent Decree with the EPA.  To the contrary, the

19   Court finds that Plaintiff's share should be increased as a

20   result of its overly aggressive tactics during the

21   negotiations with the Task Force that interfered with

22   Defendant's ability to negotiate on its own behalf with the

23   other PRPs.

24        Prior to the mediation in August of 2001, Plaintiff and

25   Defendant discussed their respective positions with respect

26   to the appropriate allocation of liability for the NavCom

27   Property.  Because the parties disagreed, Defendant, as

28   current owner of the NavCom Property, informed Plaintiff that

1  it intended to negotiate its share of liability for the
2  NavCom Property on its own behalf, and specifically advised
3  Plaintiff that if Plaintiff elected to make an offer to the
4  other members of the Task Force which included the NavCom
5  Property, Plaintiff did so at its own risk.

6      Notwithstanding Defendant's explicit admonition to the
7  contrary, during the mediation Plaintiff agreed to a 36.5%
8  share on behalf of the NavCom, Birtcher, and Chadwick
9  Properties.  At the time Plaintiff made this offer, Plaintiff
10  knew that the response costs for the NavCom Property would
11  greatly exceed its $2,500,000 indemnification obligation
12  under the Purchase Agreement, yet Plaintiff deliberately
13  chose to exclude Defendant from the negotiations.  After
14  making this offer, during private negotiations between
15  Plaintiff and Defendant outside of the mediation, Plaintiff
16  proposed that Defendant should bear responsibility for 21% of
17  the 36.5% share offered by Plaintiff - a much larger share
18  than Defendant reasonably believed it should have to pay or
19  had ever offered to pay.

20      As a result of Plaintiff's actions, Defendant was
21  prejudiced in its efforts to negotiate its liability for the
22  NavCom Property with the PRPs on its own behalf and enter
23  into the Consent Decree with the EPA with an allocation that
24  was acceptable to Defendant.  After Plaintiff made its 36.5%
25  offer, Defendant was unable to successfully negotiate with
26  the other PRPs unless it agreed to a number in excess of that
27  which Plaintiff had offered.  Clearly this was not a
28  realistic possibility, as Defendant believed its share to be

1  far less than what Plaintiff had already offered on its

2  behalf.   Thus, Defendant was left with the unenviable choice

3  of either accepting the 21% share that Plaintiff insisted

4  upon and sign the Consent Decree, or terminate its efforts

5  with respect to the Consent Decree process and wait for

6  Plaintiff to file suit.

7      Plaintiff claims that its actions were justified because

8  Defendant's continued "low offers" to the other PRPs

9  presented a risk that the PRPs would not be able to arrive at

10 a GFO to present the EPA, and that the PRPs would suffer

11 monetary penalties as a result.   Plaintiff's argument is

12 based entirely on its own self-serving speculation and is not

13 supported by any credible evidence.   Plaintiff does not, and

14 cannot know what would have happened if Defendant had been

15 allowed to negotiate on its own behalf.   Because Plaintiff

16 was not responsible for the costs of remediation of the

17 NavCom Property under the terms of the Assumption Agreement,

18 Plaintiff should have restricted its negotiations with the

19 Task Force to its liability for the Chadwick and Birtcher

20 Properties.   Its failure to do so results in this Court's

21 equitable allocation of an increase in liability to Plaintiff

22 for those Properties.

23     Plaintiff also argues that, at the very least,

24 Defendant's share should be increased as a result of

25 Defendant's conduct during the Task Force mediation when it

26 did not provide its five highest contamination results to the

27 other PRPs.   However, as the Court has already found,

28 Defendant's error was unintentional.   Indeed, any amount of

1   fault that could be attributed to Defendant for this mistake

2   would be equal to the amount of fault attributable to

3   Plaintiff for its failure to disclose the "Pedrola dumping"

4   to the other PRPs during the mediation.

5       Plaintiff also claims that under the equitable factor

6   regarding "knowledge and/or acquiescence of the parties in

7   the contaminating activities," Defendant's share should be

8   increased because Defendant continued to use clarifier C-002

9   after it purchased the NavCom Property in 1988 even though it

10  was aware at that time of the environmental contamination

11  resulting from use of the clarifier.  However, as the Court

12  found in the preceding section, there is no evidence in the

13  record that Defendant ever discharged either TCE or PCE to

14  clarifier C-002 during its ownership of the NavCom Property.[15]

15  As a result, the Court will not increase Defendant's share as

16  requested by Plaintiff.

17      Based on the foregoing application of the relevant

18  equitable factors, the Court allocates to Defendant 60% of

19  the remaining response costs for the remediation of the

20  groundwater in the "shallow" and "deep" aquifers underlying

21  the East Side EMOU.  This allocation is based upon

22  Defendant's obligation to Plaintiff under the Assumption

23  Agreement and the evidence regarding the actual amount of

24

25      [15] Moreover, to the extent Defendant discharged PCE or TCE
    to clarifier C-002 after its acquisition of the NavCom
26  Property in 1988, the Court finds that any fault which could
    be assigned to Defendant for that act would be "equal" to the
27  fault assigned to Plaintiff for the continuous dumping of
    large amounts of TCE directly onto the soil at the Birtcher
    Property as testified to by Mr. Pedrola.
28

1  contamination attributable to the NavCom Property, and takes
2  into consideration Plaintiff's conduct during the Task Force
3  negotiations.

4

5     **B.   CERCLA Damages**

6      The parties agree that the CERCLA damages which Plaintiff
7  can recover from Defendant total the amount of the eligible
8  CERCLA response costs incurred by Plaintiff, less any
9  offsets, multiplied by the allocation percentage of 60% that
10 the Court has found is attributable to Defendant.

11

12        1.   <u>Eligible CERCLA Response Costs Incurred by</u>
13             <u>Plaintiff</u>

14      Prior to trial, the parties stipulated that Plaintiff's
15 recoverable past response costs would be limited to those
16 response costs incurred through July 31, 2006.  Plaintiff
17 alleges that prior to July 31, 2006, it incurred
18 $9,078,003.57 of eligible CERCLA response costs as follows:

19

20

| | |
|---|---|
| GeoSyntec Invoices | $3,959,465.59 |
| Payment to West Side EMOU Work Parties | $3,300,000.00 |
| EPA Oversight Costs | $1,622,789.23 |
| Miscellaneous Vendors | $195,748.66 |
| **TOTAL** | **$9,078,003.57** |

26

27      Defendant does not dispute that Plaintiff is entitled to
28 recover its response costs paid to the West Side EMOU working

1 | parties, the EPA oversight costs, or the payments to
2 | miscellaneous vendors, nor does Defendant dispute the amounts
3 | claimed by Plaintiff in each of those categories.  The Court
4 | has reviewed the amounts paid by Plaintiff to the West Side
5 | EMOU working parties, the EPA, and to the miscellaneous
6 | vendors and finds that those costs are properly recoverable
7 | as CERCLA response costs.

8 | Although Defendant does not dispute that a portion of the
9 | money paid by Plaintiff to GeoSyntec is recoverable as
10 | response costs, Defendant disputes the amount of those
11 | recoverable response costs.[16]  The basis for Defendant's
12 | objection arises out of the fact that GeoSyntec invoices
13 | totaling $926,854.64, which were characterized by Plaintiff
14 | prior to trial as non-CERLCA costs, are included in the
15 | amount Plaintiff claims are CERCLA response costs.

16 | Throughout the course of discovery and continuing into
17 | the preparation of its pre-trial documents, Plaintiff claimed
18 | that in addition to its CERCLA response costs, it was also
19 | entitled to $1,778,785.25 in contract damages on its Second
20 | Claim for Relief.  As discussed in more detail, *infra*,
21 | Plaintiff argues that although these damages represent money
22 | paid to GeoSyntec, these damages are non-CERCLA costs which

---

[16] Initially, Defendant argued that the amount of recoverable GeoSyntec costs should be decreased to $3,909,069.46 consistent with Plaintiff's September 18, 2006 interrogatory responses.  Thereafter, Plaintiff informed Defendant that it had mistakenly omitted GeoSyntec invoices totaling $50,396.13 from its interrogatory responses.  Based on Defendant's Post-Trial Brief, the Court finds that Defendant has abandoned that request for reduction.  *See* Ex. A to Defendant's Post-Trial Brief.

1  Plaintiff incurred solely as a result of Defendant's alleged
2  breach of the Assumption Agreement.

3      Plaintiff's claim for $1,778,785.25 in contract damages
4  was incorporated into the trial declarations of Plaintiff's
5  witnesses filed with the Court prior to trial.  Then, on
6  November 28, 2006 - just one week prior to trial, Plaintiff
7  filed its Trial Brief in which, "[w]ith considerable egg on
8  its face," Plaintiff acknowledged a substantial error in its
9  damages claims.  Specifically, Plaintiff explained that
10 "certain GeoSyntec bills were inadvertently treated both as a
11 CERCLA response cost and as a separately recoverable contract
12 consequential damage."  *See* Plaintiff's Pre-Trial Brief at
13 17.  Plaintiff further claimed that the "double-counted"
14 invoices were properly regarded as CERCLA response costs, and
15 that the alleged contract damages should be reduced by
16 $926,854.64 to $851,930.61.  During trial, Thomas Rich,
17 Plaintiff's Chief Administrative Officer and Secretary,
18 confirmed the "error" and reiterated that the "double-
19 counted" invoices should be considered only as CERCLA
20 response costs and not as contract damages.  *See* 12/6/06 Tr.
21 Trans. at 17:8-18:3.

22     Defendant argues that the "double-counted" invoices which
23 were originally considered to be non-CERCLA costs should
24 remain in the category of alleged contract damages, and that
25 the amount of CERCLA response costs paid to GeoSyntec should
26 instead be reduced by $926,854.64.  In support of its
27 argument, Defendant relies on Plaintiff's judicial admissions
28 categorizing the invoices as non-CERCLA costs in its

1   pleadings and discovery responses prior to trial, and the
2   admission by Mr. Rich during trial that "Gould team counsel"
3   was involved in the decision to change the accounting
4   treatment of those costs.  *See* 12/6/06 Tr. Trans. at 70:1-9.
5        All of the GeoSyntec invoices offered as evidence by
6   Plaintiff are contained in Plaintiff's Trial Exhibits 1056
7   and 1057.  Exhibit 1056 contains invoices dated July 25, 2001
8   through January 21, 2003 and covers services rendered
9   starting in May of 2001 and continuing through December 31,
10  2002.  Exhibit 1057 contains invoices dated February 17, 2003
11  through August 23, 2006 and covers services rendered
12  beginning in January of 2003 and continuing through July 31,
13  2006.  In his trial declaration, Mr. Rich testified that
14  Exhibit 1056 represents the invoices "for work incurred
15  during the allocation process prior to and unrelated to work
16  required by the Consent Decree." Rich Tr. Decl. at ¶ 19.
17  Mr. Rich then explained that Exhibit 1057 represents response
18  costs paid by Plaintiff through July 31, 2006.  *Id.* at ¶ 21.
19       After attempting to "correct" its "error" at trial,
20  Plaintiff never specifically identified for the Court which
21  of the foregoing invoices are included in the disputed amount
22  of $926,854.64.  However, based on the evidence and
23  testimony, the Court determined that Plaintiff arrived at the
24  amount of $926,854.64 by totaling the invoices dated February
25  ·17, 2003 through April 16, 2004 for services rendered from
26  January 1, 2003 through March 31, 2004, along with those
27  portions of the invoices dated May 12, 2004 for services
28  rendered in April of 2004 prior to the Consent Decree.

1    Pursuant to Section 107(a), a plaintiff may recover only

2    those response costs that are necessary and consistent with

3    the National Contingency Plan (""NCP"). *See* 42 U.S.C.

4    § 9607(a)(1-4)(B) (a potentially responsible party is liable

5    for, *inter alia*, "any other necessary costs of response

6    incurred by any other person consistent with the national

7    contingency plan."). "Consistency with the NCP is not only

8    an essential element of proof under § 9607(a) but also

9    becomes the lynchpin for [a] § 9613(f) contribution [claim]."

10   *Public Service Co. of Colorado v. Gates Rubber Co.*, 175 F.3d

11   1177, 1181, n.5 (10th Cir. 1999).  Accordingly, once the

12   Court finds that Defendant is liable as a PRP, the Court must

13   then determine which costs are recoverable before allocating

14   liability under CERCLA's contribution provision.  *See, e.g.,*

15   *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir. 1989).

16   As a private party seeking contribution for response costs

17   under Section 113(f), Plaintiff has the burden of proving

18   that the costs incurred constitute recoverable response costs

19   under CERCLA.  *See, e.g., Washington State Dept. of Transp.*

20   *v. Washington Natural Gas Co.*, 59 F.3d 793, 799-800 (9th Cir.

21   1995).

22   The Court finds, and Defendant does not dispute, that all

23   costs incurred by GeoSyntec after the entry of the Consent

24   Decree on April 16, 2004 are recoverable as response costs

25   under CERCLA.  *See* 40 C.F.R. § 300.700(c)(3)(ii) ("Any

26   response action carried out in compliance with the terms of

27   an order issued by EPA pursuant to section 106 of CERCLA, or

28   a consent decree entered into pursuant to section 122 of

1    CERCLA, will be considered "consistent with the NCP.").

2    However, with respect to those costs incurred between January

3    1, 2003 and April 16, 2004 prior to the entry of the Consent

4    Decree, Plaintiff has failed to meet its burden of proof.

5         Rather than separate the costs incurred during that time

6    period by the actual services performed by GeoSyntec,

7    Plaintiff instead categorizes those costs by date.  It is

8    clear even from a cursory review of the GeoSyntec invoices

9    during this time period that categorization of CERCLA versus

10   non-CERLCA costs by date alone is inappropriate.  For

11   example, invoice number 234037 dated March 17, 2004 includes

12   a charge for over $20,000 in advocacy costs.  During trial,

13   Thomas Vinckier, principal geologist and hydrogeologist with

14   GeoSyntec, agreed that time billed under the category of

15   advocacy costs could include "not only negotiations with the

16   task force but [also] litigation activity" "depending on the

17   time frame of the bill." *See* 12/5/06 Tr. Trans. at 44:15-

18   45:13.  Not all of the type of advocacy work described by Mr.

19   Vinckier would be a recoverable response cost.  *See Key*

20   *Tronic Corp. v. U.S.*, 511 U.S. 809, 820 (1994). However,

21   because neither Mr. Vinckier nor his counsel ever attempted

22   to clarify the nature of the services rendered or the

23   relevant time frames, or otherwise offer the Court evidence

24   sufficient for the Court to interpret those invoices, the

25   Court cannot determine without speculation whether

26   unrecoverable "advocacy costs" are included within the

27   invoices during the pre-Consent Decree period of time for

28   which Plaintiff seeks recovery of all of its costs.

1    The invoices themselves are of no assistance, as they

2    only summarize the hours spent on a particular day by a

3    particular person within a broad category, but do not

4    describe the nature of the actual services rendered.  *See*

5    12/5/06 Tr. Trans. at 42:17-43:7.  Although detailed billing

6    is not necessarily required to recover response costs, where

7    there is a question as to whether the work performed is

8    properly categorized as a "response cost," it is Plaintiff's

9    burden to provide sufficiently detailed bills which would

10    allow the Court to make an independent determination.  The

11    Court cannot, and simply will not engage in speculation as to

12    whether the money spent by Plaintiff during the period at

13    issue was in fact properly categorized as CERCLA response

14    costs.

15    Indeed, even GeoSyntec employees are unable to explain

16    the billing process with any consistency.  From the invoices,

17    it appears that GeoSyntec used three project codes to

18    distinguish certain of its charges to Plaintiff.  On the

19    Invoices, Project HX0113 is identified as "El Monte - RD/RA,"

20    Project HX0113E is identified as "El Monte - ERAP," and

21    Project HX0113F is identified as "El-Monte - Federal Grant

22    Program."  *See*  Plaintiff's Tr. Ex. 1056 and 1057.  Although

23    it would appear at first glance that these project numbers

24    might assist in establishing the nature of the services

25    performed by GeoSyntec, the testimony of Mr. Vinckier

26    demonstrated otherwise.  During trial, Mr. Vinckier testified

27    that Project HX0113F was for RD/RA work notwithstanding the

28    fact that the invoices indicate that Project HX0113F was for

billing related to the "Federal Grant Program." *See* 12/5/06 Tr. Trans. at 43:17-44:2.

Additionally, on cross examination, Mr. Vinckier testified that Plaintiff was reimbursed by funds from the Task Force for some of the money that Plaintiff paid to GeoSyntec prior to the entry of the Consent Decree. *See* 12/5/06 Tr. Trans. at 45:18-46:3. However, Mr. Vinckier testified that he "[did] not know how much specifically was reimbursed," and Plaintiff did not attempt to identify for the Court which invoices had been reimbursed. *See id.* Based on all of the foregoing, the Court finds that Plaintiff has failed to meet its burden of proving that any of the costs incurred prior to the entry of Consent Decree are CERCLA response costs. Accordingly, the Court finds that the amount of the GeoSyntec invoices claimed as CERCLA response costs should be reduced by $926,854.64.

As a result, the Court finds that the total amount of eligible CERCLA response costs incurred by Plaintiff prior to July 31, 2006 is as follows:

| | |
|---|---|
| GeoSyntec Invoices | $3,032,610.95 |
| Payment to West Side EMOU Work Parties | $3,300,000.00 |
| EPA Oversight Costs | $1,622,789.23 |
| Miscellaneous Vendors | $195,748.66 |
| **TOTAL** | **$8,151,148.93** |

/ / /

/ / /

1          2.   Offsets

2          The parties agree that Defendant is entitled to an offset

3    in the amount of $6,062,500 for those cash payments received

4    by Plaintiff pursuant to the terms of the Consent Decree.

5    Plaintiff claims that the payments under the Consent Decree

6    are the only offsets to which Defendant is entitled under

7    CERCLA.

8          Defendant argues that it is entitled to an additional

9    offset in the amount of $200,000, which represents the Task

10   Force funds for the Early Response Action Plan ("ERAP") that

11   were remaining in the Task Force trust account after the

12   entry of the Consent Decree and were transferred to Plaintiff

13   as part of the Task Force Termination Agreement.  Plaintiff

14   argues that Defendant is not entitled to these funds because

15   the Task Force assigned the funds to Plaintiff "in

16   recognition of its lead role and the substantial expenses

17   incurred in leading the GFO negotiations and Consent Decree

18   negotiations with [the] EPA."  Plaintiff's Post-Trial Brief

19   at 20.

20         Plaintiff's attempt to re-write history in the face of an

21   agreement which clearly provides to the contrary is

22   troubling.  Plaintiff's argument not only blatantly

23   misrepresents the Task Force Termination Agreement, it is yet

24   another example of Plaintiff's flagrant and consistent over-

25   reaching in this case.  Paragraph 4.5.1 of the Final

26   Allocation Agreement for the Task Force expressly states

27   that:

28   / / /

1          In consideration of the fact that the majority

2          of past expenditures of ERAP funds by the

3          Members have been directed to response actions

4          on West Side of the EMOU, all other Members

5          shall assign to Gould Electronics, Inc., for

6          the performance of response actions on the

7          East Side of the EMOU, all remaining ERAP

8          funds that are currently held either in the

9          bank account(s) of the NEMCTF of by the San

10         Gabriel Water Quality Authority for future

11         disbursement to the NEMCTF.

12   *See* Plaintiff's Trial Exhibit 414 at ¶ 4.5.1; *see also*

13   Plaintiff's Trial Exhibit 603, Final Agreement Amending Task

14   Force Agreement, at ¶ 3.4.1.  It is clear from the foregoing

15   that the remaining ERAP funds were given to Plaintiff to

16   benefit the remediation efforts of the entire East Side EMOU,

17   not just to reduce Plaintiff's own share of the response

18   costs.  Indeed, had the situation been reversed and the

19   majority of expenditures of ERAP funds been used to remediate

20   the East Side EMOU prior to the entry of the consent Decree,

21   Defendant's exposure would have been decreased by that

22   amount.  Accordingly, the Court finds Defendant is entitled

23   to an offset in the amount of $200,000.[17]

24   _____

25        [17] Plaintiff also claims in Opposition to Defendant's
     assertion that Defendant contributed to the Task Force funds

26   that "NDE has never made any payments to Task Force."
     Plaintiff's Marked Version of Defendant's FFCL (12/21/06) at

27   83.  However, Plaintiff admits that at the time the Task
     Force ERAP fund was created, Defendant agreed to contribute

28   10% which Plaintiff then paid on Defendant's behalf as a
                                                  (continued...)

1    Similarly, Defendant argues that it is entitled to an

2  offset in the amount of $1,003,497.67, which represents the

3  amount of money received by Plaintiff from the WQA.  Prior to

4  the entry of the Consent Decree, the WQA agreed that it would

5  "match," up to $1,150,000, funds contributed by the members

6  of the Task Force for activities in connection with the ERAP.

7  Plaintiff relies on the same specious argument as with the

8  $200,000, and further argues that because the funds are not

9  "federal funds," CERCLA does not "mandate" an offset.  As set

10  forth above, the Court finds that the Task Force intended

11  that the matching funds from the WQA be used to benefit the

12  remediation of the entirety of the East Side EMOU, not just

13  Plaintiff's portion of the response costs.  Moreover, Grace

14  Burgess, Executive Director of the WQA, testified in her

15  trial declaration that the funds received by the Plaintiff on

16  behalf of the Task Force were, in fact, federal funds

17  distributed by the WQA.  *See* G. Burgess Tr. Decl. at ¶ 11.[18]

18

19

20    [17](...continued)
result of its indemnification obligations under the Purchase
Agreement.  To the extent Plaintiff seeks a credit in the

21  amount of the funds it contributed on Defendant's behalf,
Plaintiff must be consistent and recognize that Defendant

22  "contributed" to the Task Force fund.  Defendant should
clearly be entitled to benefit from the remainder of a fund

23  to which it was a contributor.

24    [18] At trial, the Court took Plaintiff's objections to the
following trial exhibits attached to the trial declaration of

25  Grace Burgess and offered by Defendant under submission:
2520, 2523, 2524, 2528, 2527, 2530, 2523, and 2511.  Upon

26  further review of the foregoing exhibits and Plaintiff's
objections to those exhibits, the Court overrules each of

27  Plaintiff's objections.  Accordingly, Defendant's Trial
Exhibits 2520, 2523, 2524, 2528, 2527, 2530, 2523, and 2511

28  are admitted into evidence.

1   Plaintiff also claims that Defendant is not entitled to

2   an offset of the WQA funds because Plaintiff assigned its

3   subrogation rights to the WQA.  The fact of Plaintiff's

4   assignment only lends further credibility to Defendant's

5   position that it is entitled to an offset.  Essentially,

6   Plaintiff assigned its rights to recover against Defendant in

7   an amount equivalent to that which was paid by the WQA to

8   Plaintiff.  Plaintiff can no longer sue on that amount, as

9   the right to sue and recover that portion of the money from

10  Defendant now belongs to the WQA, not to Plaintiff.  For all

11  of the foregoing reasons,  the Court finds that Defendant is

12  entitled to an offset in the amount of $1,003,497.67.[19]

13  Defendant also argues that it is entitled to an offset in

14  the amount of $1,100,000, which represents the amount paid by

15  the Jarvis Defendants in a private settlement of this action

16  with Plaintiff.  The Court disagrees.  The settlement amount

17  paid by the Jarvis Defendants was not paid to benefit the

18  entirety of the East Side EMOU as with the funds from the

19

20  [19] There is also a dispute regarding the proper allocation
    of federal funding for which Plaintiff has applied through
    the WQA.  At present, the WQA has promised future funding in
21  the amount of $4,800,000.  Defendant claims that it is
    entitled to future offsets of this funding.  Plaintiff argues
22  that Defendant should not benefit from Plaintiff's grant
    efforts, while in the same breath includes in its post-
23  Consent Decree CERCLA response costs certain GeoSyntec
    invoices which specify that they are for "Federal Grant
24  Program."  Plaintiff simply cannot expect Defendant to pay
    for a portion of its grant efforts, and then not participate
25  in the recovery which results from those efforts.  Although
    Plaintiff is correct that the issue is premature as it has
26  not yet received any of the promised grant money, the Court
    expects that in light of the Court's position on this issue,
27  the parties will be able to resolve this issue without future
    Court intervention.
28

1    Task Force and WQA.   Rather, those funds were paid to settle
2    the Jarvis Defendants' liability to Plaintiff for their
3    "role" in the contamination of and their responsibility for
4    the remediation of the Birtcher Property.   Because those
5    funds are private settlement funds paid between PRPs who are
6    responsible for the remediation of the Birtcher Property, the
7    Court finds that Defendant is not entitled to an offset in
8    the amount of $1,100,000.

9        Similarly, Defendant argues that it is entitled to an
10   offset in the amount of "at least" $588,513.18, which
11   represents the money paid by Johnson Controls, the other
12   working party for the East Side EMOU, to Plaintiff pursuant
13   to a private settlement agreement.   As with the Jarvis
14   Defendants' settlement, the Court finds that the money paid
15   by Johnson Controls was not intended to generally benefit the
16   remediation efforts on the East Side EMOU, but to privately
17   resolve liability between two of the parties responsible for
18   the contamination and remediation of the Birtcher Property.
19   Moreover, to the extent the settlement amount represents
20   response costs paid by Johnson Controls as a working party,
21   because Johnson Controls assigned its rights to seek
22   contribution from Defendant to Plaintiff, Johnson Controls
23   cannot sue Defendant to recover a portion of those response
24   costs from Defendant.   Accordingly, the Court finds that
25   Defendant is not entitled to an offset in the amount of
26   $588,513.18.

27       Finally, Defendant argues that it is entitled to an
28   offset equal to the value of the in-kind contributions to be

made by the City of El Monte toward the remediation of the groundwater on the East Side EMOU.  However, to the extent the City is going to provide actual labor toward the remediation of the groundwater on the East Side EMOU instead of money, that effort will necessarily reduce the response costs incurred by the working parties.  Defendant will benefit equally from the City's in-kind contributions, because for every dollar saved by the working parties as a result of action taken by the City, that is $0.60 less that Defendant will have to pay for those future response costs. Accordingly, Defendant is not entitled to any offsets related to the City's in-kind contributions.

Based on the foregoing analysis, the Court finds that Defendant is entitled to offsets in the following amounts:

| Eligible Response Costs | $8,151,148.93 |
|---|---|
| Less the Consent Decree Funds | ($6,062,000.00) |
| Less the WQA Funds | ($1,003,497.67) |
| Less the Remaining Task Force Funds | ($200,000.00) |
| **Total Response Costs:** | **$885,651.26** |

As set forth above, based on the Court's determination regarding the appropriate equitable allocation of liability, Defendant is responsible for 60% of the remaining balance of the total response costs ($885,651.26 * .60), or $531,390.75. As a result, Plaintiff's CERCLA damages on its First Claim for Relief would be $531,390.75.

1    However, the Court's analysis does not end there, as both
2    parties agree that Defendant is still entitled to
3    indemnification under Paragraph 6.7 of the Purchase Agreement
4    in the amount of $587,719.68.  Moreover, Plaintiff admits
5    that any judgment on its CERCLA claim for relief is subject
6    to a credit/reduction in the amount of its indemnification
7    obligations remaining under the Purchase Agreement.  *See*
8    Plaintiff's Closing Argument Brief at 19.  When Plaintiff's
9    CERCLA damages in the amount of $531,390.75 is subtracted
10   from Plaintiff's remaining indemnification obligation of
11   $587,719.68, a credit of $56,328.93 remains.  As a result,
12   Defendant does not owe Plaintiff for any past response costs,
13   and in fact, still has a credit under Paragraph 6.7 of the
14   Purchase Agreement in the amount of $56,328.93 to be applied
15   toward Defendant's liability for future response costs.
16
17   **IV.  Plaintiff's Second Claim for Relief for Breach of the**
18        **Assumption Agreement**
19        In its Second Claim for Relief, Plaintiff alleges that
20   Defendant breached the Assumption Agreement by failing to
21   indemnify Plaintiff for those response costs incurred for the
22   NavCom Property in excess of Plaintiff's $2.5 million
23   indemnification obligation contained in Paragraph 6.7 of the
24   Purchase Agreement.  However, based on the Court's findings
25   on Plaintiff's First Claim for Relief, the Court finds that
26   Defendant has not breached the Assumption Agreement, because
27   Plaintiff has not yet fully performed its obligations under
28   the Purchase Agreement.

1    As the Court previously found, Defendant's liability for
2  the contamination of the NavCom Property (which, pursuant to
3  the terms of the Assumption Agreement, incorporates
4  Plaintiff's liability for that site) only accounts for 60% of
5  the contamination of the groundwater on the East Side EMOU.
6  As of July 31, 2006, Defendant is only responsible for past
7  response costs in the amount of $531,390.75.  Because
8  Plaintiff still owes Defendant indemnification in the amount
9  of $56,328.93 under Paragraph 6.7 of the Purchase Agreement,
10  Defendant is not yet obligated to indemnify Plaintiff under
11  the terms of the Assumption Agreement.

12    Plaintiff also argues that even if it has not yet fully
13  performed its indemnification obligation under the Purchase
14  Agreement, it is still entitled to consequential damages
15  arising out of Defendant's "anticipatory repudiation" of the
16  Assumption Agreement as set forth in the August 20, 2001
17  letter from Mr. Veysey to Mr. Christ and Mr. Russo.
18  Specifically, Plaintiff claims that but for this alleged
19  repudiation, it would not have hired GeoSyntec, and therefore
20  seeks recovery in the amount of its pre-Consent Decree
21  invoices from GeoSyntec.

22    However, as is clear from the August 21, 2001 letter from
23  Mr. Christ responding to Mr. Veysey's August 20, 2001 letter,
24  Defendant did not repudiate its obligations to Plaintiff, but
25  in fact affirmed those obligations.  Moreover, the subject of
26  this exchange of correspondence was the Purchase Agreement,
27  not the Assumption Agreement.
28  / / /

1       The evidence presented at trial also directly
2   contradicted Plaintiff's claim that GeoSyntec was hired as a
3   result of a breach of the Assumption Agreement by Defendant.
4   Plaintiff first retained GeoSyntec in May of 2001.  It simply
5   would have been impossible for Plaintiff to hire GeoSyntec in
6   May of 2001 in response to something that would allegedly
7   take place at least three months later in August of 2001.
8   Moreover, Plaintiff's witnesses testified at trial that
9   GeoSyntec was hired for reasons totally independent of any
10   conduct by Defendant.  *See*, *e.g.*, Tr. Trans. at 155:9-18.  It
11   is clear from the evidence and testimony that GeoSyntec was
12   hired because Plaintiff anticipated that it would receive a
13   Special Notice letter from the EPA, and Plaintiff needed an
14   independent consultant to provide Plaintiff with an overall
15   assessment of its potential exposure for the Birtcher and
16   Chadwick Properties (in addition to the NavCom Property) for
17   the purposes of negotiating with the other PRPs.
18       Accordingly, the Court finds that Defendant did not
19   anticipatorily repudiate or otherwise breach the Assumption
20   Agreement.

21                         **Conclusions of Law**

22       1.   The Court has original jurisdiction over the federal
23   claims asserted in this action pursuant to 28 U.S.C. § 1331
24   in that the case arises under the Comprehensive Environmental
25   Response, Compensation, and Liability Act 42 U.S.C. § 9601,
26   *et seq.*  The Court also has jurisdiction over the state law
27   claims under the doctrine of supplemental jurisdiction set
28   forth in 28 U.S.C. § 1367.

1        2.   Venue is proper in the United States District Court

2   for the Central District of California under 42 U.S.C.

3   § 9613(b) and 28 U.S.C. § 1391(b).[20]

4        3.   Defendant NDE is an "owner" and an "operator" of a

5   "facility" located at 4323 N. Arden Drive, El Monte,

6   California as those terms are defined in Section 9601(20) of

7   CERCLA, 42 U.S.C. § 9601(20) and (9).

8        4.   TCE and PCE are hazardous substances as defined in

9   Section 9601(14) of CERCLA, 42 U.S.C. § 9601(14).

10       5.   NDE is a "person" liable or potentially liable under

11  Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as that term

12  is defined in Section 9601(21).

13       6.   Plaintiff failed to meet its burden of proving that

14  it is entitled to recovery on its First Claim for Relief for

15  contribution under CERCLA Section 113.

16       7.   Plaintiff failed to meet its burden of proving that

17  Defendant breached the Assumption Agreement or that Plaintiff

18  is otherwise entitled to recovery on its Second Claim for

19  Relief for breach of contract.

20       8.   With respect to Plaintiff's Third Claim for Relief

21  for Declaratory Relief, the Court concludes that the

22  Assumption Agreement is enforceable against Defendant, and

23  that Defendant is obligated to indemnify Plaintiff for those

24  response costs incurred by Plaintiff for remediation of the

25  NavCom Property in excess of the $2.5 million indemnification

26  obligation contained in the Purchase Agreement.   Based on the

27  _____

28      [20] The parties do not dispute the facts requisite to
    federal jurisdiction and venue.

1   Court's application of the relevant CERCLA equitable factors,

2   which took into consideration the foregoing conclusion

3   regarding Defendant's obligations to Plaintiff under the

4   Assumption Agreement, the Court concludes that Defendant is

5   liable to Plaintiff for 60% of the future response costs

6   (commencing July 31, 2006) incurred by Plaintiff and Johnson

7   Controls for remediation of TCE and PCE contamination in the

8   groundwater underlying the East Side EMOU.

9         9.   Defendant failed to meet its burden of proof with

10   respect to each of its affirmative defenses at issue in this

11   action.

12         The Court orders the parties to meet and confer to

13   prepare a joint proposed Judgment which is consistent with

14   the Court's Findings of Fact and Conclusions of Law.   The

15   parties shall lodge the joint proposed Judgment with the

16   Court on or before April 20, 2007.   If the parties are unable

17   to agree upon a joint proposed Judgment, the parties shall

18   each submit separate versions of a proposed Judgment along

19   with a declaration outlining their objections to the opposing

20   party's version no later than April 20, 2007.

23   Dated: April 12, 2007

JOHN F. WALTER
UNITED STATES DISTRICT JUDGE